Mr. Chief Justice Shaeket
delivered the opinion of the Court.
Reading instituted this suit in the Court below, to recover the sum of $ 119, for the use and occupation of a portion of the bank of the Mississippi river, in front of the city of Vicksburg. The parties went to trial on an agreed state of facts, by which the owner *396 ship of Reading is admitted as bounded on the west by the Mississippi river, and the occupancy of the defendants below high water mark with their flat boats, by tying their boats, and delivering goods from a platform extended to the shore, for the number of days charged in the declaration — one hundred and nineteen. By this agreement it is admitted that Reading had published his rates for the use of his landing at the price of one dollar per day, and that the defendants below took possession, knowing the published terms, but without any special contract with Reading. The defendants claimed a right to occupy the bank as an incident to the free navigation of the Mississippi river. They were citizens of Ohio, and regular flat-boat traders, and during their occupancy, always refused to pay Reading, on the ground that they had a right to use the bank of the river below high water mark.
The plaintiff below presented his case to the jury by reading the agreed state of facts, and thereupon the defendants offered to introduce deeds, and also parol evidence to prove the boundary of Vicksburg, and to prove the ownership of another individual in front of the boats above high water mark. This evidence was excluded. During the progress of the trial, certain charges were given in favor> of the plaintiff’s right, to which the defendants excepted ; and certain other charges, declaring the banks of the Mississippi to be a part of the common highway, and open to public use as an incident to navigation, were refused.
The assignment of errors presents, in substance, two questions. First, did the Court err in excluding evidence tending to vary and contradict the agreed state of facts ; and, second, has the owner of the bank of the Mississippi river a right to recover for use and occupation, or riparian rent, for the use of the bank below high water mark, or is it subject to the unrestricted use of persons navigating the Mississippi.
The first point seems to require but a passing remark. When parties to a suit agree upon the facts of the case, and for the purpose of using that agreement as evidence, reduce it to writing, they are concluded by it, as far as it goes. No evidence to vary or contradict it can be admitted, for this would be taking the other party by surprise. If this evidence had been admitted, and the verdict *397 had been different, Reading might well have complained of surprise. The object and the effect of the rejected evidence, was materially to change the facts agreed on, and it was therefore very properly excluded.
We come now to inquire into the relative rights of riparian owners on the Mississippi, and of the public. This is the main point in the controversy, and on it the counsel for the plaintiffs in error have addressed us a very ingenious argument, evincive of great research, in favor of the rights of their clients. In support of this position, we are referred to the laws of nature and of nations ; the common law ; the French and Spanish laws ; and treaties and acts of Congress. The argument is founded, however, mainly on the civil or French law, on the ground that the Mississippi was first discovered by subjects of France, and, from its source to its mouth, became thereby subject to her dominion. Amidst this multitude of authority, derived from codes differing essentially in their provisions, it becomes important, in the outset, to determine what law is to furnish the rule for our decision. A glance at a few prominent features in the early history of this country, will enable us, as we think, to settle this point without much difficulty. France, although not the first to discover, was the first owner, by appropriations of the Mississippi and all the territory of its tributaries. By treaty with Great Britain, in 1763, to which Spain was a party, France ceded to Great Britain all her territory east of the Mississippi and north of the river Iberville, and the two powers fixed the boundary between them, “by a line drawn along the middle of the river Mississippi, from its source to the river Iberville, and from thence by a line drawn along the middle of this river, and the lakes Maure-pas and Pontchartrain, to the sea.” Great Britain continued to be the owner of the ceded territory until the 30th of November, 1782, when, by a provisional treaty, she acknowledged the independence of the United States, bounded on the west, above the 31st degree of north latitude, by a line drawn along the middle of the Mississippi river, corresponding exactly with the boundary in the treaty with France. This provisional treaty became operative by reason of the treaty of peace between France and Great Britain, and all its provisions were incorporated in the definitive treaty of peace, *398 concluded on the 3d of September, 1783. Great Britain, at the same time, ceded West Florida, which, by that government, had been extended to the mouth of the Yazoo-, to Spain ; but as, by the provisional treaty, the southern boundary of the United States had been fixed at the 31st degree of north latitude, Spain acquired nothing above that parallel, as Great Britain had previously disposed of it. ' Thus, the United States succeeded to all the territory east of a line drawn along the middle of the Mississippi, above the 31st degree of latitude. This left Louisiana bounded on the east by the same line, the middle of the river, above the river Iberville, as it had been established by the treaty of 1763 ; and by that boundary it was ceded by France to Spain, and by Spain retroceded to France, and ultimately, by France, in 1803, to the United States ; so that no variation of this line, up to that time, 'had taken place. In 1798, whilst this' was still the line between the United States and the province of Louisiana, Congress established the Mississippi Territory, bounding it on the west “by the Mississippi.” Laws of the U. S., vol. iii. p. 39. And, in 1817, Mississippi was admitted into the Union, with its boundary up the Mississippi river, from the 31st degree of north latitude to the southern point of Tennessee on that river. Laws of the U. S., vol. vi. pp. 175, 356. In 1804, Louisiana was divided into two territories; the Territory of Orleans to embrace all the territory which had been ceded by France, west of the Mississippi below the 33d degree of north latitude,-and east of the same river below the 31st'flegree. Laws of the U.’ S., vol. iii. p. 60S. Louisiana was admitted into .the Union with her boundary running “down the said river ” (the Mississippi). Laws of the U. S., vol. iv. p.' 402. In defining the territorial and state boundaries, Congress adopted the more general mode of defining boundary on water-courses, and omitted to designate the middle of the river as the limit, but, as we shall endeavor to show, did not thereby change the original boundary. When the Mississippi Territory was organized, in 1798, the ordinance, which had been adopted for the government of the NorthWestern Territory, was extended to the Mississippi Territory. Laws of the U. S., vol. iii. p. 39. In that ordinance, we find this provision : “ The inhabitants of said territory shall always be *399 entitled to the benefits of the writ of habeas corpus, and of the trial by jury ; of a proportionate representation of the people in the legislature, and of judicial proceedings according t the course of the Common .Law.” Laws of the U. S., vol. i. p. 475. Thus, we find the Common Law adopted for the government of the Mississippi Territory, and, by that means, all other systems of law virtually abolished. We have been thus particular, in order to meet fully the arguments of counsel, and also to show the true boundary between the common and civil law. The middle of the river being the dividing line, it follows that all grants, public as well as private, within the Common Law jurisdiction, must be construed by the rules of the.Common Law. We have said that Congress omitted to mention the middle of the river, but bounded the territory “by the Mississippi.” The Common Law, by construction, extends grants, bounded “ by,” or “ on,” or “ along ” a fresh water stream, to the thread of the stream. The Mississippi Territory, by this rule, extended to the middle of the river. All west of that line was owned by a foreign power, and we cannot suppose that Congress, under the circumstances, designed to limit the jurisdiction of the territory by the bank of the river. Having shown then that the Common Law .was adopted for the government of the Mississippi Territory, and that the line of the territory was the middle of the river, it follows, that the rights of riparian owners on the east shore, must be determined by the Common Law. We thus dispose of so much of the argument as invokes the rules of the Civil Law.
But say the counsel, by the Common Law also their clients were justified in the use of the banks of the river. A passage from Bracton is relied on as high authority, which is as follows : “ But all rivers and ports are public. Hence the right of fishing in a port or in rivers is common. By the law of nations, the use of the banks also is as public as the rivers ; therefore all persons are at equal liberty to land their vessels, unload them, and fasten their cables to the trees upon the banks, as to navigate the fiver* itself; still the banks of the river are the property of those who possess the land adjoining, and therefore the trees which grow upon them are the property of the same persons.”
*400 It is said, that in accordance with this doctrine, several decisions have, been made in England. The case of Warren v. Mathews, referred to, only decides that every subject may fish in a navigable river, as well as in the sea. The case of Ward v. Creswell, decides in effect the same thing, and so does the case of Carter v. Murcot. But there is no analogy between the right to fish in the sea or a navigable river, and a right to use the bank of a fresh water stream. In reference to riparian rights, the English decisions have not followed the doctrine of Bracton. Ball v. Herbert, 3 Durn. & East, 253, is a leading case. The question was as to the right of the public to a tow-path on the river Ouse, which was by the plea alleged to be a navigable river, where the tide ebbs and flows. Lord Kenyon said that such a right might be supported on the ground of long usage, but not as a Common Law right. He referred to Lord Hale’s treatise, De Jure Maris, &c., as containing the true doctrine of the Common Law, and concludes thus : “ Therefore on these authorities, on the silence in the books respecting this Common Law right, and on account of the extreme inconvenience to which individuals having lands adjoining the public rivers would be subject, I cannot bring my mind to say that the defendant’s justification can be supported.” Mr. Justice Ashhurst was of the same opinion. Mr. Justice Buller said, no such general usage existed, and thus commented on the passage from Bracton : “ Another authority cited, is the passage from Bracton, and quoted by Callis ; that plainly appears to have been taken from Justinian, and is only part of the Civil Law ; and whether or not that has been adopted by the Common Law, is to be seen by looking into our books, and there it is not to be found.” The case of Blundell v. Catrell, 5 Barn. & Ald. 91, must put this question at rest, so far as the English decisions can do so. That was trespass for using a part of the sea shore which had become private property, by passing over it with bathing machines between high and low water mark, to which the defendant pleaded the public right. The case was very fully considered by all the Judges of the King’s Bench. Mr. Justice Holroyd said the passage from Bracton was copied from the Civil Law, and added : “ But whatever may be found in the Civil Law upon this subject, and whatever may have been stated by some of *401 our law writers from the Civil Law, or may be found to have dropped as dicta from some of our Judges, yet it appears, I think, that the Civil Law as applicable to this subject, differs from the Common Law of England ; that its principles have not only not been adopted into the Common Law, but are at variance with it, and are therefore no guide to us ; that the public right to the extent claimed in this case, is not only not found to be established by our law, but that the established principles of our law are inconsistent with it.” “ But further,” continued this Judge, “ such a general public right in all the king’s subjects, to use the sea shore for all such temporary purposes as they please, would be, I think, inconsistent with the nature of permanent private property, or with the sea shore becoming such private property.” He also gives unqualified, approbation to the treatise of Lord Hale, and shows that the only two cases which followed the doctrine of Bracton, were overruled in Ball v. Herbert. Mr. Justice Bayley also expressed his opinion as clearly against such Common Law right as that claimed. Chief Justice Abbott placed the question on its broadest foundation, and denied the existence of any such "right, even as a question of commerce. He said : “ As the waters of the sea are open to the use of all lawful purposes, it has been contended as a general proposition, that there must be an equally universal right of access to them for all such purposes over land like the present. But, in my opinion, there is no sufficient ground, either in authority or in reason, to support this general proposition. Commerce is a matter greatly favored in our law, by reason of the public and national benefits derived from it; but, even as to this favored matter, I have found no authority in the law of England to support such a proposition.”
We come, then, to the doctrine of Lord Hale, whose treatise, Be Jure JWaris, &c. we have seen, is, regarded as authority. He says, “ Fresh rivers of what kind soever, do, of common'right, belong to the owners of the soil adjacent.” He further says, “ There be some streams or rivers that are private, not only in propriety or ownership, but also in use, as little streams and rivers that are not a common passage for the king’s people. Again ; there be other rivers, as well fresh as salt, that are of common or public use for carriage of boats ■ or lighters. And these, whether they are fresh or salt, whether they *402 flow and reflow or not, are prima facie publici juris, common highways for man or goods, or both, from one inland town to' 'another.” Whilst the learned author is explicit that even private rivers may be liable to a public servitude, he is silent as to the banks of such rivers being subject to a like servitude. This same learned author in another treatise, De Portibus Maris, says : “ Though A. may have the propriety of a creek or harbor, or navigable river, yet the king may grant there the liberty of a port1 to B. and so the interest of the propriety, and the interest of the franchise, several and divided, and in this no injury atall is done to A., for he hath what he had before, viz. the interest of the soil, and consequently theimprovement of the shore, and the liberty of fishing ; and as the creek was free for any one to pass in it against all but the king (for it was pub-lici juris as to the matter before), so now the king takes off that restraint, and by his license and charter, makes it free for all to come and unlade. Bub if A. hath the ripa or bank of the port, the king may not grant a liberty to unlade upon that bank or ripa without, his consent, unless custom had made the liberty thereof free to all, as in many places it is ; for that would be a prejudice to the private interest of A., which may not be taken from him without his consent.'”
Thus we perceive that he gives no countenance to the notion that the public have a right to the use of a bank where it is private property, although the stream itself may be a public highway.
The. American decisions have generally conformed to the Common Law doctrine. Before we proceed to an examination of them, it is necessary to mark the distinction between a navigable river, and one which is not navigable, within the legal signification of that term, because many of the decisions seem to be based upon that distinction. The phrase u navigable river,” has a technical meaning in the Common Law. A river is navigable in the technical sense, as high up from its mouth as the tide flows. Angelí on Watercourses, 204,205. Above that it may be a common highway, subject to the use of the public for navigation according to the common acceptation of the term, but it is not technically a navigable river. The soil under a river which is navigable in the technical sense, does not belong to the riparian owners, but to the public. According to this author, a river may be regarded in three points of *403 view ; first, when it is altogether private, as in the case of shallow streams ; secondly, when it is private property, but subject to public use-; and thirdly, when the use and property are both public ; and he mentions the Hudson as furnishing an example ; being private.in one part, subject to public use in another; and public property as high up as the tide flows.
In the case of Palmer v. Mulligan, Chancellor Kent held that the banks of the Hudson, above tide water, were private property, and subject to the exclusive appropriation of the owner, although the river was a common highway, and subject to the public servitude. The same doctrine prevailed in the case of Hooker v. Cummings, 20 J. Rep. 90; and in Ecc parte Jennings, 6 Cowen, 518. This question has recently undergone a very full examination in New York, and it was settled that the public have not the right to use and. occupy'the soil of an individual adjoining navigable waters, as a public landing, and place of deposit of property in its transit, against the will of the owner. Pearsall v. Post, 22 Wend. 425. The rule as laid down by Chancellor Kent is, that grants of land on rivers or along the same, 'above tide water, carry the exclusive right of the grantee to the middle of the stream, unless the grant clearly denotes an intention to stop at the edge of the stream ; and if the river is navigable for boats, the public have an easement therein, or right of passage as a highway. But the proprietors of the banks have a right to use the land and water, in any way not inconsistent with the easement, and it would require an exception in the grant, or a clear and unequivocal declaration, or immemorial usage, to limit the title of the owner to the edge of the river. 3 Kent, 427, 428.
In the case of Adams v. Pease, 2 Conn. Rep. 481, it was held ‘that the owner of the adjacent land had an exclusive right of fishing in the Connecticut river, above tide water, on the ground that the river was not navigable, and that he was therefore owner adfilum medium aquae. On the same principle was the case of Ingraham v. Wilkinson decided, 4 Pickering, 268, and also the Commonwealth v. Chapin, 5 Pickering, 199.
It seems that the Common Law rule admits of no modification in consequence of the magnitude of a river. On the Ohio river, *404 which is certain!y one of the first magnitude, the Common Law prevails in regard to the rights of riparian proprietors. Lessee of McCulloch v. Aten, 2 Ohio Rep. 307; Lessee of Blanchard v. Porter, 11 Ohio Rep. 138. And in that State it has been adjudged that the ordinance of 1787, for the government of the North-Western Territory, which declares that the navigable waters leading into the Mississippi shall be common highways, and forever free, does not impair or abolish the Common Law principle, that he who owns the bank, owns to the middle of the river, subject to the easement of navigation. See 3 Kent’s Com. (5th ed.) 427, and notes.
In Missouri, it is true, this question has been decided differently in regard to the rights of riparian proprietors on the Mississippi. It was held in the case of O’Fallon v. Daggett, 4 Missouri Rep. 343, that the navigable rivers in that State are public highways, and that although the banks may be private property, yet that fishermen and navigators are entitled to use them in landing, in fastening, and in repairing their vessels, and for exposing their sales or merchandize ; yet this right was held to be a qualified one, and that such use could not lawfully be continued for several weeks ; that houses could not be built for the purpose of enabling navigators to repair their vessels. This case arose under a grant made to an individual by the Spanish government, whilst it was the owner of the territory, and it was decided exclusively on a passage in the Partidas, and the Louisiana decisions. It is therefore not authority in a case depending on the Common Law.
In Pennsylvania, too, the Courts have departed from the Common Law doctrine on this subject; but it is enough for us to say, that we do not feel warranted in following their example, unless such departure is justified by some general regulation of the Federal government, which is a point that remains to be considered, as counsel have insisted that by treaties and various acts of Congress the Mississippi river is made an exception to the rule.
By the provisional treaty with Great Britain, to which we have before referred, it was declared that the navigation of the Mississippi should forever remain free and open to the subjects of both nations. By the act admitting Louisiana into the Union, the Mississippi was declared to be a u common highway, and forever free” to *405 the inhabitants of all the States. Public Land Laws, Part 1, p. 185.
By the act of the 3d of March, 1803, providing for the sale of the public lands south of the State of Tennessee, it is declared that all navigable rivers within the territory of the United States, south of the State of Tennessee, shall be deemed to be and remain public highways. Ib. 98. By the act providing for the sale of lands in Indiana Territory, it was provided that all the navigable rivers, creeks and waters w'ithin the Territory, should be deemed and remain public highways. Ib. 107. By the act providing for the adjustment of land claims in the territories of Orleans and Louisiana, it was provided that all navigable rivers and waters in the territories, should be, and forever remain, public highways. Ib. 195. By the act providing for the Missouri Territory, it is declared that the Mississippi and Missouri rivers, and the navigable waters flowing into them, shall be common highways, and forever free to the people of the territory, and of the United States, without any tax, duty, or impost therefor. Ib. 216. By the act providing for the admission of Mississippi into the Union, it is provided that the Mississippi river, and the navigable rivers and vvaters leading into the same, or into the Gulf of Mexico, shall be common highways,.and forever free to the citizens of the United States, without any tax, duty, impost, or toll therefor, imposed by said State. Ib. 286. And the same provision is inserted in the act providing for the admission of Alabama into the Union, in reference to the rivers in that State. Ib. 310. These several provisions do nothing more than secure the free navigation of the rivers and water-courses mentioned, to all the people of the United States. The rivers are declared to be public highways, free for the use of- all, without any tax, or duty for such use, to be imposed by the States. But in these provisions there is nothing which appropriates the banks to the like purposes. There are reservations of the rivers for public uses, but they contain no reservations of the banks ; and if Chancellor Kent is right in asserting that it requires an express exception in the grant, or some clear and unequivocal declaration to limit the title of the riparian owner, there is nothing in these acts which does so limit it. That such limitation might be made by general law, is undoubtedly true ; but it *406 mast be expressed, or result necessarily from tbe nature of the*law. These acts, whilst they secure the public easement to the river itself, were mostly designed to limit the power of the States, by placing it out of their power to impose taxes, duties or imposts for the use of the navigation. A highway is a thoroughfare, common to all, whether it be on land or water, and tbe law with respect to public highways, and to fresh water rivers, is the same, as regards the right of soil. 3 Kent, 432. Congress has given no new capacities or incidents to these rivers, but has merely declared that the facilities afforded by the natural capacities of the rivers to the public, shall remain without interruption. It is by all these acts, in effect, declared that the navigation of navigable rivers shall be free to all without State interposition, or individual interruption. No principle of the Common Law is materially changed, either in regard to the rights of the public, or of the riparian owner. Or if these provisions do operate to produce any change, it can only extend to the bed of the river, and not to the banks above low water nyirk. In view of all these acts of Congress, it has been decided in Alabama, that in grants from the government to individuals, bounded on water-courses, there is an implied exception of the bed of a fresh water river, beyond low water mark. Bullock v. Wilson, 2 Porter’s Rep. 436. Supposing this to be the true doctrine, it does not alter this case, because tbe bank was used above low water mark.
The authorities cited establish the following conclusions : 1. That even the sea-shore, which is generally subject to public use below ordinary high water mark, is not subject to such use when it has become private property, such use being inconsistent with private right. 2. That there is a material difference between rivers which are navigable, and those which are not navigable, according to the Common Law meaning of the term. On rivers not navigable, the riparian proprietor, by construction of the Common Law, owns to the thread of the stream, unless restricted by the grant; and the bank being private property, subject to the exclusive appropriation of the owner, is not subject to the use óf the public, although the river itself be a public highway, the use of which may not be interrupted even by the owner. 3. That as the-bank cannot be used without the consent of the owner, he may re *407 quire satisfaction, and if he has published his1 terms, which are known to any one using the bank, it amounts to an implied promise to pay. It is not necessary to say more than was said in the case in Alabama, that the riparian proprietors on the Mississippi own at least ’ to low water mark. By an application of these conclusions to the case at bar, it is plain that the plaintiffs in error are not entitled to judgment. They claim something more than a right to use the bank as an incident to navigation. They took possession and held it for four months, which was an interruption to navigation, and an actual appropriation of the bank to their private use, not justified even by the Civil Law.
The protection of the rights of the riparian owner, so far from being detrimental to navigation, is important to its perfect enjoyment. By this means safe wharves and landings are secured by the improvements put on the bank. If the. public has a right to use the'bank as an incident to navigation, every such wharf, and every improvement of the landing, would be in law a nuisance;
We are* not called on to say that the navigators of the Mississippi, may not, in cases of necessity, use the bank or fasten to the trees. As. a matter of convenience, too, this is often done, without objection on the part of the owner. Often it is for his advantage, but when it is not, there is generally no injury, or if there be any; it is so slight that no complaint is likely to be made. There is a salutary check against frivolous and vexatious suits.
The judgment must be affirmed.
Mr. Justice Claxton
delivered the following opinion..
I concur in the opinion of the Chief Justice in most respects, and in the conclusion in this particular cause. The plaintiffs in error could have no right to occupy the land of the defendant in error for so long a period without making compensation.
But I desire to reserve the expression of any opinion as to the right of persons navigating the Mississippi river to land when necessary to moor their vessels to the shore.
The free navigation of that river has been guaranteed in several different modes referred to in the opinion in chief. This unquestionable right carries with it all the means necessary for the accom *408 plishment of the end. 1 Kent, 35. I should be unwilling, therefore, in this case, to say anything which could give countenance to the idea, that the right to land and moor vessels to the shore for purposes necessary to navigation, could be questioned or embarrassed by the owners of the bank. Probably there is jjut little cause for fear on this head, but it is not improper to guard against a possible contingency. The right to charge for the use of wharves, erected for the convenience of commerce and the benefit of navigation, depends on a different principle, and those who use them may be justly considered to have consented to pay for the increased facilities they afford.